[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10723

_____

CHASE PEDEN,
MARJORIE PEDEN,

Plaintiffs-Appellants,

*versus*

GLENN STEPHENS,
CAROLE STEPHENS,
BUTCH CONWAY,
LOU SOLIS,
DANNY PORTER, et al.,

Defendants-Appellees,

TONY THOMAS,

Intervenor.

———————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-05861-TWT

———————————————

Before WILLIAM PRYOR, Chief Judge, LUCK, Circuit Judge, and
MOORER,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

This summary-judgment appeal concerns adultery, defama-
tion, and our appellate jurisdiction. Chase Peden, a sheriff's depart-
ment employee, had an affair with the wife of a county administra-
tor. The mistress allegedly conducted a smear campaign against
Mrs. Peden and, when the affair ended, against Mr. Peden as well.
The sheriff's department fired Mr. Peden, and a local prosecutor
declined to prosecute the mistress for harassment. Suspecting the
county administrator had a hand in both actions, the Pedens sued
the mistress, the county administrator, and a host of other county

———————————————

[*] The Honorable Terry F. Moorer, United States District Judge for the South-
ern District of Alabama, sitting by designation.

officials for violating state and federal law. The district court entered a summary judgment in favor of the officials and certified that judgment as final even though claims against the mistress remained pending. *See* FED. R. CIV. P. 54(b). Because the district court abused its discretion when it determined that the summary judgment warranted certification under Rule 54(b), we lack jurisdiction. So, we dismiss the appeal.

## I. BACKGROUND

In 2014, Chase Peden, an employee of the Gwinnett County Sheriff's Department, began an affair with Carole Stephens. Mr. Peden was married to Marjorie Peden. Mrs. Stephens was married to Glenn Stephens, the Gwinnett County Administrator.

Around the time the affair began, someone began sending anonymous messages to the Pedens and people who knew them. Letters sent to the Pedens' church and the Pedens' minor daughter "accused Mrs. Peden of being seen in the company of men other than her husband." Mrs. Peden also received letters that stated or implied that her husband was having an affair. The Pedens believe that Mrs. Stephens was responsible.

This conduct did not let up, even after the affair ended sometime in 2017. Later that year, the Sheriff's Department received a letter—referred to by the parties as the "Michael Letter" after its pseudonymous author—accusing Mr. Peden of "us[ing] his sheriff's car, county[-]issued phone, uniform[,] and time on the clock to meet his girlfriend[s]." The Michael Letter also accused Mr. Peden

"of having sex while on duty and using his handcuffs and patrol car during sexual encounters with women at his part-time . . . security job at a . . . nightclub." And the letter mentioned a specific rendez-vous "with another woman" at a fire station, a reference to a real meeting between Mr. Peden and Mrs. Stephens.

Chief Deputy Lou Solis directed the internal affairs unit to investigate the allegations in the Michael Letter. The investigators determined that Mr. Peden had committed neglect of duty, mis-used county property, and engaged in conduct unbecoming of a county employee—albeit based on conduct unrelated to the affair. Deputy Solis sustained the determinations, as did Sheriff R.L. "Butch" Conway. In the light of the report, Sheriff Conway termi-nated Mr. Peden. The Pedens suspect "that there was a *quid pro quo* arrangement between [Mr. Stephens and Sheriff Conway] that [Sheriff] Conway would terminate [Mr.] Peden if [Mr.] Stephens approved the purchase of" a 2018 Dodge Charger Hellcat for the sheriff's use.

In April 2018, Tony Thomas, a television reporter, made a request under Georgia's open-records law to the Sheriff's Depart-ment for information about Mr. Peden's firing. Thomas did not ex-plain how he learned about the firing. The Department gave Thomas a copy of Mr. Peden's file.

The next day, Thomas ran a televised news story about Mr. Peden. The story mentioned the Michael Letter. And it contained video clips of the investigators' interviews with Mr. Peden. Because those recordings were not yet available to the public, even through

an open-records request, the Pedens surmise that someone in the Sheriff's Department leaked the recordings to Thomas.

The Pedens met with Gwinnett Judicial Circuit District Attorney Daniel "Danny" Porter about charging Mrs. Stephens with a crime because she continued to harass the Pedens and their children. District Attorney Porter told Mr. Stephens that he planned to interview Mrs. Stephens and permitted Mr. Stephens to attend the interview. After the interview, the district attorney declined to prosecute.

The Pedens brought a six-count complaint for damages against Glenn and Carole Stephens, Sheriff Conway, Deputy Solis, District Attorney Porter, and a John Doe defendant. Count one alleged that Deputy Solis and Mr. Stephens violated Mr. Peden's due-process rights by having him fired and by "orchestrat[ing] the leak" of the Michael Letter. *See* 42 U.S.C. § 1983. Count two, against Mr. Stephens and District Attorney Porter, alleged that the decision not to prosecute Mrs. Stephens deprived the Pedens of the equal protection of the laws. *See id.* Counts three and four alleged that Mr. Stephens, Sheriff Conway, Deputy Solis, and District Attorney Porter had conspired to deprive the Pedens of their constitutional rights. *See id.* § 1985. Count five alleged that the Michael Letter was defamatory, that Mrs. Stephens wrote the letter, and that Mr. Stephens, Sheriff Conway, Deputy Solis, and a John Doe conspired with Mrs. Stephens "to reveal" to the press "confidential documents and video from the Sheriff's Department's investigation."

Count six alleged that all the defendants engaged in intentional infliction of emotional distress against the Pedens.

While discovery was ongoing, the parties engaged in motion practice. The district court denied as untimely a motion to amend the complaint. The district court granted a motion to dismiss District Attorney Porter based on prosecutorial immunity. The district court also granted a motion to quash a subpoena directed at reporter Tony Thomas, whom the Pedens sought to depose.

At the close of discovery, Mr. Stephens, Sheriff Conway, and Deputy Solis moved for summary judgment. In response, the Pedens "voluntarily withdr[e]w" counts three and four, the section-1985 claims, but opposed the other portions of the motions. The Pedens did not request or receive permission to amend the pleadings to remove the withdrawn counts from the complaint. *See* FED. R. CIV. P. 15(a)(2).

The district court granted the motions for summary judgment. The district court stated that it would address only counts one, two, five, and six because the Pedens had "voluntarily withdrawn Counts III and IV." And it determined that the officials were entitled to summary judgment on the remaining claims against them.

Mr. Stephens, Sheriff Conway, and Deputy Solis then requested entry of partial final judgment. *See* FED. R. CIV. P. 54(b). They acknowledged that the claims against Mrs. Stephens remained pending. But the officials explained that there were "no

further viable claims remaining against" them. And they argued that there was "no just reason for delay[ing]" the entry of final judgment in their favor. *See id.* The officials asserted that the "pending . . . claim[s] against Mrs. Stephens [were] not factually intertwined with those against [Mr.] Stephens, [Sheriff] Conway, and [Deputy] Solis." And the officials asserted that "equitable concerns weigh[ed] in [their] favor" because "a final judgment could be years away" if the claims against Mrs. Stephens went to trial "given the current situation regarding the COVID-19 pandemic."

The district court granted the motion for entry of partial final judgment. The district court again mentioned that the Pedens had "withdrawn their claims in Counts III and IV." It concluded that the order granting the officials' motion for summary judgment was final as to Mr. Stephens, Sheriff Conway, and Deputy Solis because the order "completely dispose[d] of all viable claims against [them]." It concluded that the "adjudicated claims against [the officials were] distinct from" the claims still pending against Mrs. Stephens because "[t]he record reflects that the factual bases for these claims are different" and "[t]he legal defenses and theories are different." It concluded that "the equitable concerns weigh[ed] in favor of" the officials: "This litigation could potentially remain pending for quite a lengthy time due to the COVID-19 pandemic." And it concluded that the entry of partial final judgment would "in no way prejudice [the Pedens'] ability to pursue their remaining claims." So, the district court entered judgment in favor of "Glenn

Stephens, R.L. 'Butch' Conway, and Lou Solis as to Counts I, II, V, and VI of the First Amended Complaint."

Before the deadline for noticing an appeal from the Rule 54(b) order, Mrs. Stephens filed—and the district court granted in part—a motion for summary judgment. The district court granted the motion as to the emotional-distress claim. But it permitted the defamation claim against Mrs. Stephens to proceed to trial.

The Pedens timely appealed the Rule 54(b) order, and we asked the parties to answer a jurisdictional question: "Please address whether the voluntary withdrawal of Counts III and IV was valid. If the voluntary withdrawal was not valid, please address whether the district court's entry of judgment under Rule 54(b) was appropriate." (Citations omitted.) The Pedens argued that the withdrawn counts "exist[ed] in a kind of procedural limbo, neither viable nor settled," and that the Rule 54(b) certification was inappropriate. The officials argued that the voluntary withdrawal was valid, and that the certification was appropriate for the reasons given by the district court.

## II.  STANDARDS OF REVIEW

Two standards govern our review of a Rule 54(b) certification. "We review *de novo* the district court's determination that its partial adjudication [under Rule 54(b)] amounted to a final judgment." *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 778 (11th Cir. 2007). And we review for an abuse of discretion a reasoned finding that there was "no just reason for delay."

*See id.* (citation omitted); *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 166 (11th Cir. 1997) ("We will not disturb the district court's assessment unless it was clearly unreasonable."); FED. R. CIV. P. 54(b).

## III. DISCUSSION

"We have a threshold obligation to ensure that we have jurisdiction to hear an appeal, for without jurisdiction we cannot proceed at all in any cause." *Acheron Cap., Ltd. v. Mukamal*, 22 F.4th 979, 986 (11th Cir. 2022) (internal quotation marks omitted). "That obligation is not diminished in the slightest by the parties' apparent acquiescence in the district court's determination that Rule 54(b) certification was appropriate." *Ebrahimi*, 114 F.3d at 165. This Court treats the validity of a Rule 54(b) certification as a jurisdictional issue, *see id.*, so we must address that issue first. And because the issue is dispositive, we do not reach the merits of the appeal. *See United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019).

"The existence of appellate jurisdiction in a specific federal court over a given type of case is dependent upon authority expressly conferred by statute." *Vachon v. Travelers Home & Marine Ins. Co.*, 20 F.4th 1343, 1346 (11th Cir. 2021) (alteration adopted) (internal quotation marks omitted). "[T]he relevant statute grants appellate courts jurisdiction to hear appeals only from 'final decisions' of district courts." *Johnson v. Jones*, 515 U.S. 304, 309 (1995) (quoting 28 U.S.C. § 1291). And "[a] final decision is typically one that ends the litigation on the merits and leaves nothing for the

court to do but execute its judgment." *Acheron Cap.*, 22 F.4th at 986 (internal quotation marks omitted).

Rule 54(b), promulgated under the Supreme Court's authority to "define when a ruling of a district court is final," 28 U.S.C. § 2072(c), provides a modest exception to the general definition of finality, *see Ebrahami*, 114 F.3d at 165. The rule provides that, "[w]hen an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties . . . if the court expressly determines that there is no just reason for delay." FED. R. CIV. P. 54(b). Although the provision is worded permissively, "appeals before the end of district court proceedings . . . are the exception, not the rule." *Johnson*, 515 U.S. at 309; *see also Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438 (1956) ("Rule 54(b) . . . operates to restrict . . . the number of appeals in multiple claims actions.").

"A district court must follow a two-step analysis in determining whether a partial final judgment may properly be certified under Rule 54(b)." *Lloyd Noland Found.*, 483 F.3d at 777. "First, the court must determine that its final judgment is, in fact, both final and a judgment." *Id.* (internal quotation marks omitted). "That is, the court's decision must be 'final' in the sense that it is an ultimate disposition of an individual claim entered in the course of a multiple claims action, and a 'judgment' in the sense that it is a decision upon a cognizable claim for relief." *Id.* (internal quotation marks omitted).

Second, if the district court determines that its decision is a final judgment, "the district court must then determine that there is no just reason for delay in certifying it[s] [decision] as final and immediately appealable." *Id.* (internal quotation marks omitted); *see* FED. R. CIV. P. 54(b). This second determination requires the district court to consider "judicial administrative interests—including the historic federal policy against piecemeal appeals—and the equities involved." *Lloyd Noland Found.*, 483 F.3d at 778 (internal quotation marks omitted). Because Rule 54(b) certifications depart from that historic federal policy, we have explained that "certifications must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." *Ebrahimi*, 114 F.3d at 166 (internal quotation marks omitted). These unusual "circumstances will be encountered only rarely." *Id.*

We express no opinion about the determination that there was a final judgment because the second determination—that there was "no just reason for delay," *see* FED. R. CIV. P. 54(b)—was an abuse of discretion. That determination rested on the erroneous conclusion that the "equitable concerns weigh[ed] in favor of" certification. "The federal concept of sound judicial administration and efficiency will not normally be furthered by having piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case . . . ." *Ebrahimi*, 114 F.3d at 167

(alteration adopted) (internal quotation marks omitted). The district court's reasoning—that "[n]othing . . . indicates that [the officials] should endure the hardship of having to deal with the pendency of this litigation"—turns the presumption against Rule 54(b) certification on its head. *See id.* (dismissing an appeal where the Rule 54(b) order stated that "no useful purpose can be served by postponing final disposition of claims which should not have been pursued" (internal quotation marks omitted)). The purpose of considering "relevant equitable concerns" is "to *limit* Rule 54(b) certification to instances in which immediate appeal would alleviate some [particular] danger of hardship or injustice associated with delay," *see id.* at 166 (emphasis added), not to *expand* the availability of Rule 54(b) to all parties with clean hands. This kind of "liberal construction [of Rule 54(b)] would only exacerbate the difficulties associated with our burgeoning caseload by promoting multiple appeals in a single case." *See id.* at 167.

Consider *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021), a decision that illustrates the proper use of a Rule 54(b) certification. There, "[f]our Jane Does filed nearly identical amended complaints against individuals and businesses involved in the hotel industry." *Id.* at 719. The district court granted some defendants' motions to dismiss for failure to state a claim, and the Does requested Rule 54(b) certifications. *Id.* at 721. The Does gave the following four reasons in support of the requests:

> (1) the immediate resolution of an appeal would resolve issues in all four interrelated Doe actions,

> streamlining the litigation; (2) there would be a risk of duplicative discovery and trials without an immediate appeal, and an immediate appeal could serve to limit the scope of discovery; (3) the cases were still in the early stages of discovery, so duplicative discovery could best be avoided now; and (4) COVID-19's impact on the defendants' operations could diminish the Does' ability to recover later on.

*Id.* The district court granted the request, and we concluded that "[t]he district court did not abuse its discretion in concluding that there was no just reason for delay due to the unique circumstances of these cases." *Id.* at 722. We explained that "[a]ddressing this consolidated appeal now [would] significantly enhance[] the efficiency of the litigation" and that "[t]he relatedness of the[] four cases, their early stage in litigation, the number of defendants involved, and the substantial discovery to be had are the kind of special circumstances that warrant appellate review." *Id.* at 723 (internal quotation marks omitted).

Those special circumstances are absent here. The determination in this case that there was no just reason for delay rested on a single factual finding—that "[t]his litigation could potentially remain pending for quite a lengthy time due to the COVID-19 pandemic." But unlike in *Doe #1*, where pandemic-related delays "could diminish the [plaintiffs'] ability to recover later on," *see id.* at 721, there is no indication that the delays here would cause anything other than inconvenience. Indeed, if pandemic-related delays alone justified an immediate appeal, "Rule 54(b) certifications"

would cease to "be reserved for the unusual case." *See Ebrahimi*, 114 F.3d at 166 (internal quotation marks omitted). And, without additional record evidence, there is no reason to suppose that an immediate appeal will sufficiently increase efficiency or that the officials have such a "pressing need[] . . . for an early and separate judgment" that the Court should tolerate "the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket." *Id.*; *cf. id.* at 166–67 ("[W]hen a sound basis for the certification is not obvious and the district court merely repeats the language of the Rule or frames its certification in conclusory terms, we have little choice but to dismiss the appeal . . . .").

## IV. CONCLUSION

We **DISMISS** the appeal for lack of jurisdiction.